# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

RAYMOND MCGOVERN,

          Plaintiff,

       v.

GEORGE WASHINGTON UNIVERSITY, *et al.*,

          Defendants.

Civil Action No. 14-215 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

The plaintiff, Raymond McGovern, claims violations of his constitutional rights by the defendants, George Washington University ("GW"), and three individuals employed by GW as Special Police Officers ("SPOs"), Christopher Brown, Michael Glaubach, and Jamie Barton, arising from the plaintiff's arrest after he "engaged in a silent expression of dissent" during an address by then-Secretary of State Hillary Clinton on GW's property. *See* Compl. at 1–2; ¶¶ 1–2, 28, ECF No. 1. The defendants have moved for summary judgment, *see* Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 42, and the plaintiff has moved for partial summary judgment, *see* Pl.'s Mot. Summ. J. ("Pl.'s Mot."), ECF No. 43, as well as to strike an exhibit submitted by the defendants in support of their motion for summary judgment, *see* Pl.'s Mot. Strike, ECF No. 53. In the plaintiff's view, at the heart of this suit is the "conflict of interest in the use of Special Police Officer . . . authority by private institutions," since "SPOs are not subject to the same accountability as are traditional public law enforcement," even though authorized by the state to exercise arrest power. Pl.'s Mem. P. & A. Opp. Defs.' Mot. Summ. J. ("Pl.'s Opp'n") at 1, ECF No. 49. Yet, as explained below, even holding the individual defendants to the standards applicable to government-employed police officers, the plaintiff in this case has not established a

1

violation of his constitutional rights.  Accordingly, the defendants' motion for summary

judgment is granted, and the plaintiff's motion for partial summary judgment is denied.  In

addition, for the reasons set forth below, the plaintiff's motion to strike is granted.

## I.      BACKGROUND

The plaintiff, who was seventy-one years old at the time of the underlying events, is "a

veteran Army officer who served as an analyst with the Central Intelligence Agency for 27

years," writing for the President's daily brief under two presidents and personally briefing Vice

President George H.W. Bush and other officials during the administration of President Ronald

Reagan.  Plaintiff's Statement of Material Facts ("Pl.'s SMF") ¶¶ 1, 41, ECF No. 43-3.  After his

retirement from government service, the plaintiff co-founded Veteran Intelligence Professionals

for Sanity "to expose that intelligence was being falsified by the U.S. government to justify war

on Iraq."  Compl. ¶ 7; *see* Defendants' Statement of Material Facts ("Defs.' SMF") ¶ 8, ECF No.

42-3.  According to the plaintiff, he possesses "anti-war political views."  Compl. ¶ 8.

On February 15, 2011, GW, a private university in Washington, D.C., hosted an address

on Internet freedom of speech by then-Secretary of State Hillary Clinton at its Jack Morton

Auditorium.  Pl.'s SMF ¶¶ 2, 19–25; Defs.' SMF ¶¶ 1, 19.  Attendance at the event was limited

to ticketholders who had registered in advance via "an electronic invitation circulated by GW to

students, faculty and guests" and "State Department staff and the media."  Defs.' SMF ¶¶ 14; *see*

Pl.'s SMF ¶ 21.  While not among those to whom the invitation was circulated by GW, the

plaintiff knew a GW professor who facilitated the plaintiff's registration.  *See* Pl.'s SMF ¶ 22.

Prior to the event, the plaintiff "received an e-ticket via email from [GW] addressed to [the

plaintiff's email]" which stated that he was "registered to attend" the Clinton address and noted that "[g]uests must be seated by 11:40 a.m."  Pl.'s SMF ¶ 23; Defs.' SMF ¶ 17.[1]

The day of the event, the plaintiff arrived at the auditorium, located in GW's Media and Public Affairs ("MPA") building, and proceeded to check in and submit to screening through a metal detector as required by the security measures in place for the Clinton address.  Pl.'s SMF ¶ 24; Defs.' SMF ¶¶ 3, 19.  Once admitted to the auditorium, he selected a seat located near the middle of a row halfway between the front and the rear of the auditorium.  *See* Pl.'s Mot., Ex. M, ECF No. 43-17 (map of auditorium indicating the plaintiff's approximation of the location of the seat he selected); Pl.'s SMF ¶ 20; Defs.' SMF ¶ 21.  Several media outlets, including GW's campus newspaper, *The Hatchet*, as well as CNN and PBS, were positioned around the auditorium to capture video footage of the event.  *See, e.g.*, Pl.'s SMF ¶ 32; Defs.' SMF ¶ 26.

When Secretary Clinton took the stage, the members of the audience, including the plaintiff, collectively stood and applauded.  *See* Pl.'s SMF ¶ 26; Defs.' SMF ¶ 22.  When the other members of the audience took their seats, the plaintiff remained standing and turned such that his back was toward Secretary Clinton.  *See* Pl.'s SMF ¶ 28; Defs.' SMF ¶ 23.  At that time, the plaintiff's "Veterans for Peace t-shirt" was visible, although he had passed through security screening wearing a dress shirt and jacket.  Pl.'s SMF ¶ 28; *see* Defs.' Mot., Ex. 1, McGovern Dep. 37:4–38:10, ECF No. 42-4.  According to the plaintiff, the "prolonged applause" caused him to recall the "adulation he observed of Soviet officials during his service for the U.S. in the Soviet Union" in a "flashback," and he "wanted to do a silent witness to disassociate [him]self from the adulation."  Pl.'s SMF ¶ 27 (quoting Pl.'s Mot., Ex. A, McGovern Dep. 50:18–53:13,

---

[1]     In their SMF, the defendants aver that the "invitation specifically stated that the Clinton Speech was a presentation and a 'seated event.'"  Defs.' SMF ¶ 17.  While the defendants' use of quotation marks suggests that the phrase "seated event" appears somewhere on the invitation cited as support for the defendants' averment, no such phrase is used on that document.  *See* Pl.'s Mot., Ex. 2, ECF No. 42-5.

ECF. No. 43-5).  While neither Secretary Clinton nor any member of the audience appeared to acknowledge explicitly the plaintiff's silent standing, the plaintiff was in the line of sight of Secretary Clinton, some audience members, and media representatives capturing the event on film.  *See generally* Pl.'s Mot., Video Ex. A ("*Hatchet* Video") (on file with the Court and counsel for the plaintiff); Defs.' Mot., Ex. 19 at 38–39, ECF No. 42-22.

The then-Chief of the GW Police Department ("GWPD"), Kevin Hay, was present in the auditorium at this time.  *See* Pl.'s SMF ¶ 33.  Upon observing the plaintiff standing silently with his back to Secretary Clinton after the rest of the audience was seated, Chief Hay left the auditorium to alert two other GWPD officers, Corporal Christopher Brown and Captain Michael Glaubach, who were present in the lobby of the MPA building.  *See id.*; Defs.' SMF ¶ 25.  Corporal Brown and Captain Glaubach then entered the auditorium and approached the plaintiff. *See* Pl.'s SMF ¶ 35; Defs.' SMF ¶ 27–28.  Corporal Brown was dressed in a GWPD uniform, while Captain Glaubach was dressed in a suit with a GWPD badge hanging from his neck.  *See Hatchet* Video 00:00–00:10.  Although the officers aver that they entered the auditorium and approached the plaintiff via the same route, *see* Defs.' Resp. Pl.'s SMF, Ex. 23, Glaubach Dep. 67:12–17, ECF No. 48-3,  the plaintiff avers that he saw only Captain Glaubach approaching him, *see* Pl.'s SMF ¶¶ 35–38, and at that time "said, U[h]-oh, what's going to happen next," Pl.'s Mot, Ex. A, McGovern Dep. 74:15–17.

Video footage capturing the events that followed shows that Captain Glaubach stood in the aisle facing the plaintiff, while Corporal Brown stood in the row with the plaintiff, slightly behind him and to his right.  *See Hatchet* Video 00:00–00:10.  Corporal Brown's hand was placed on the plaintiff's right arm, and with his face turned toward the plaintiff's right ear, the officer spoke to the plaintiff.  *Id.* at 00:00–00:05.  The plaintiff, however, made no

acknowledgement of Corporal Brown's presence.  *Id.*  Corporal Brown avers that he said to the plaintiff at least two times, in an unraised voice, "Sir, can you please come with me," and "got no response" from the plaintiff either time.  Pl.'s Mot., Ex. E, Brown Dep. 107:8–108:13, 110:1–2, ECF No. 43-9.[2]  The plaintiff avers that during this period of time he neither saw nor heard Corporal Brown, despite the officer's physical proximity.  *Id.*, Ex. A, McGovern Dep. 66:11–15.

At that point, Corporal Brown took hold of and pulled on the plaintiff's right forearm, leading to a struggle involving all three men.  *See Hatchet* Video 00:05–00:14.  As Corporal Brown pulled the plaintiff toward the aisle past the other audience members seated in row, the plaintiff reached down and grabbed onto the arms of seats.  *Id.* at 00:05–00:11.  As the plaintiff neared the aisle, Captain Glaubach placed his hands around the plaintiff's head and neck, which contact the plaintiff fought against, before grabbing the plaintiff's arms, while Corporal Brown used his full body to push the plaintiff, who continued to struggle against the officers' physical contact, toward the exit.  *Id.* at 00:10–00:16.  As they approached and passed through the exit, the plaintiff shouted, "So this is America.  This is America!," then, "Who are you?," then "I was standing there quietly," and then, "You're breaking my arm!"  *Id.* at 00:15–00:31.  All three men remained on their feet throughout these events.  *See id.*

Outside the auditorium, in the MPA building lobby, the officers identified themselves to the plaintiff and handcuffed him, using "two sets of handcuffs linked one to the other to provide a longer restraining device."  Defs.' SMF ¶ 36; *see* Pl.'s SMF ¶ 54.  According to the defendants, the plaintiff continued to resist the officers in the lobby prior to his being handcuffed.  Defs.' SMF ¶ 35.  Captain Glaubach made the decision to arrest the plaintiff for the offense of

---

[2]      The *Hatchet* Video does not capture all of the time during which Corporal Brown appeared to be speaking to the plaintiff: Corporal Brown placed his hand on the plaintiff only after first speaking to the plaintiff, *see* Defs.' SMF ¶ 31; Pl.'s SMF ¶¶ 39–40, 47–48, while the *Hatchet* Video commences during the time that Corporal Brown's hand is on the plaintiff.

disorderly conduct. *Id.* ¶ 37. Officer Jamie Barton, who had "arrived on the scene as the other officers were escorting Mr. McGovern out of the MPA building and attempting to handcuff him," "assisted in the handcuffing and conducted a search of Mr. McGovern's person." *Id.* ¶ 38; *see* Pl.'s SMF ¶ 56. According to the plaintiff, the handcuffs "bit into [his] wrists in a way that caused them to bleed," Pl.'s Opp'n, Ex. A, McGovern Dep. 72:6–9, ECF No. 49-4, and he requested medical attention, *id.* 83:17–84:4 ("I asked could somebody get some gauze or something."). The GWPD officers called Emergency Medical Services, which provided medical attention for bleeding caused by the handcuffs. *Id.*; *see* Defs.' SMF ¶ 39. The plaintiff was then taken by Officer Barton and officers of the District of Columbia Metropolitan Police Department ("MPD") to an MPD station, where Officer Barton assisted in processing the paperwork for the plaintiff's "arrest for disorderly conduct in violation of D.C. Code § 22-1321(b) using information provided by Corporal Brown and Captain Glaubach." Defs.' SMF ¶¶ 40–41; *see* Pl.'s SMF ¶ 56.[3]

While Corporal Brown, Captain Glaubach, and Officer Barton are each employed by GW, rather than a public police department, they have been commissioned by the District of Columbia as Special Police Officers ("SPOs") with the power to arrest persons who violate the law. *See* Defs.' SMF ¶¶ 4–7. The GWPD Oath of Office signed by Corporal Brown reflects that GW's SPOs "affirm" they "will enforce the laws of the District of Columbia and the policies of George Washington University." Pl.'s Mot, Ex. B, Oath of Office, ECF No. 43-6. At the time of the Clinton address, those policies included GW's "Demonstrations Policy" and "Disruption of University Functions" policy. Defs.' SMF ¶¶ 9–10; Pl.'s SMF ¶¶ 58–59; *see* Defs.' Mot, Ex. 8,

---

[3] The plaintiff has explained that he was "held [at the police station] for a few hours" before being released, and the case against him was "no papered," *i.e.*, formal charges were never filed by the prosecutor. *See* Compl. ¶¶ 68, 70.

Demonstrations Policy, ECF No. 42-11; *id.*, Ex. 9, Disruption of University Functions, ECF No. 42-12.

While asserting that "[t]he University is committed to the protection of free speech, freedom of assembly, and the right to lawful protest on the campus," Demonstrations Policy at 2, the Demonstrations Policy advises that "[d]emonstrators will be prohibited from attempting to force the cancellation or interruption of any event sponsored by the University" and those "who wish to enter a building must do so as members of the audience, and must give the speaker a respectful hearing," *id.* at 3. The Demonstrations Policy specifically notes that "[a]ll non-students are obligated to the terms of this policy during participation in such activities" and "[s]ince organizations and persons who are not part of the University community are not subject to University discipline procedures, failure to comply with this policy may result in action under terms of District of Columbia, Commonwealth of Virginia, and/or federal law, as appropriate." *Id.* at 3. The Disruption of University Functions policy prohibits "members of the university" from, *inter alia*, "engag[ing] in conduct that obstructs teaching, research, or learning . . . [or] disobey[ing] general regulations of the university." Disruption of University Functions at 1. The policy goes on to explain that "[e]xamples of disruptive conduct include . . . engaging in demonstrations that exceed the bounds of free assembly or lawful advocacy" and defines "member of the university" as "[a] person, group or organization, including visitors, having a connection with the university, whether the connection is formal or informal, recognized or unrecognized." *Id.* at 2.

At the time of the Clinton address, GW also had adopted GWPD Standard Operating Procedures ("SOPs"), which outlined the procedure for GWPD officers making arrests, as well as a "Use of Force Matrix" that categorizes conduct a GWPD officer may encounter in the

course of his duties, such as active and passive resistance, and authorizes the use of specific

types and amounts of force for each category. *See* Defs.' SMF ¶¶ 12–13.  In addition, prior to

the Clinton address, GW had circulated to GWPD officers training materials related to updates to

the District of Columbia's disorderly conduct statute that went into effect on February 1, 2011.

*See* Pl.'s SMF ¶ 66.  Those training materials included thirty-five pages of material produced by

the MPD for its officers' use and three pages of "GWPD Policy Notes."  *See* Pl.'s Mot, Ex. T,

ECF No. 43-24.  The GWPD Policy Notes were drafted by Captain Glaubach and approved by

Chief Hay.  *See* Pl.'s SMF ¶¶ 67–69.

On February 13, 2014, the plaintiff filed a three-count complaint against GW, Captain

Glaubach, Corporal Brown, Jamie Barton, and then-Secretary of State John Kerry, alleging

violations of his constitutional rights.  Compl. at 1–2, ECF No. 1.  Specifically, the plaintiff

alleged the events described above, as well as subsequent actions to investigate and monitor the

plaintiff taken by the State Department, resulted in violations of 42 U.S.C. § 1983 and his First

and Fourth Amendment rights.  *Id.* ¶¶ 88–107.  The plaintiff and Secretary Kerry stipulated to

dismissal of the plaintiff's claims against this defendant, resolving Count III of the Complaint.

*See* Stipulation of Dismissal as to Defendant John F. Kerry, ECF No. 33.  Following nineteen

months of discovery, *see* Scheduling Order, dated June 4, 2014; Amended Scheduling Order,

dated Jan. 4, 2016, the defendants filed a motion for summary judgment as to all the plaintiff's

remaining claims, *see* Defs.' Mot., and the plaintiff filed a motion for partial summary judgment,

*see* Pl.'s Mot.  In addition, the plaintiff filed a motion to strike a declaration submitted as an

exhibit in support of the defendants' motion for summary judgment and preclude use of the

declarant as a witness in this matter.  *See* Pl.'s Mot. Strike.  These motions are now ripe for

consideration.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 256 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party" (internal quotation marks omitted)); *see also* FED. R. CIV. P. 56(c), (e)(2)–(3).  When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the non-moving party, with the court determining, for each side, whether the Rule 56 standard has been met.  *See McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982) ("The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion.") (citing 10A Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 2720 (1973)); *see also Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1213 (10th Cir. 2016) ("Where, as here, we are presented with cross-motions for summary judgment, we must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." (internal quotation marks omitted)); *Pac. Indem. Co. v. Deming*, 828 F.3d 19, 23 (1st Cir. 2016) (same).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby*, 477 U.S. at 255 (alteration in original)).  Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295–96 (D.C. Cir. 2015).  In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props, Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e).  If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

## III.    DISCUSSION

To succeed on a claim against a defendant under 42 U.S.C. § 1983, a plaintiff must show that the defendant, while acting under color of law, deprived him of the "rights, privileges, or immunities secured by the Constitution and the laws" of the United States.  42 U.S.C. § 1983. Here, the plaintiff claims (1) in Count I, that he was falsely arrested "in the absence of probable cause," amounting to "an abridgment of his free speech rights," in violation of the First and Fourth Amendments, Compl. ¶ 93; and (2) in Count II, that the defendants engaged in "an unreasonable seizure and use of force, and excessive use of force" in violation of the Fourth Amendment, and "in retaliation for the fact that [the plaintiff] stood in silent dissent and silent expression," in violation of the First Amendment, Compl. ¶¶ 96, 98.  The defendants have moved for summary judgment on all claims against all defendants.  *See* Defs.' Mot. at 1.  The plaintiff moves for summary judgment only as to Count I and only as to GW, Corporal Brown, and Captain Glaubach.  *See* Pl.'s Mot. at 1.

The plaintiff has also moved to strike an exhibit submitted in support of the defendants' motion for summary judgment.  *See* Pl.'s Mot. Strike.  Given that the resolution of the motion to strike may affect the evidence to be considered in support of summary judgment, that motion will be considered before the parties' contrary assertions regarding their respective motions for summary judgment.

### A.    The Plaintiff's Motion to Strike

The plaintiff has moved to strike a previously undisclosed declaration by Elena Gillis, Suppl. Defs.' Mot. Summ. J., Ex. A, Declaration of Elena Gillis ("Gillis Decl."), ECF No. 46-1, originally submitted unsigned on March 18, 2016, *see* Defs.' Mot., Ex. 18, ECF No. 42-21, in support of the defendants' motion for summary judgment.  *See* Pl.'s Mot. Strike.  In that declaration, Gillis avers that she was a GW student in attendance at the Clinton address, seated

between the plaintiff and the aisle where the officers eventually approached him.   Gillis Decl. ¶¶ 2, 4.  She further avers that his conduct in standing during the address "was distracting and made [her] uncomfortable"; that she "heard [an officer] talking to Mr. McGovern but Mr. McGovern was not responding"; and that "Mr. McGovern struggled and tried not to go" when being removed from the aisle where he was seated, "grabb[ing] an arm of a seat and tr[ying] to hold on."  *Id.* ¶¶ 6–8.  The defendants submitted the signed version of this declaration on March 22, 2016, reflecting that the declaration had been executed on March 21, 2016.  *See id.*

The plaintiff asserts that the defendants failed to disclose this declaration to the plaintiff as required under Federal Rule of Civil Procedure 26, and that the omission is not "substantially justified" or "harmless" under Rule 37, warranting the striking of the declaration and preclusion of the use of the declarant as a witness.  Pl.'s Mot. Strike at 1–3.  In the alternative, the plaintiff argues that the declaration should be ignored because, while an unsigned copy was timely filed, the signed version was four days late.  *Id.* at 12–13.  The defendants counter that they satisfied their disclosure obligations under Rule 26 by identifying Gillis "as a person who [sic] the Defendants might rely upon at the dispositive motion or trial phase."  Defs.' Opp'n Pl.'s Mot. Strike at 8, ECF No. 54.  Regarding the plaintiff's argument that the declaration was untimely filed, the defendants assert that "Local Rule 5.4(b)(5) expressly authorizes" the filing of an unsigned declaration with a motion for summary judgment where such filing is shortly thereafter supplemented with an identical signed version.  *Id.* at 14.  While the plaintiff's request that sanctions be imposed is denied, the plaintiff's contention that the declaration was untimely filed is correct.

"[D]istrict courts have 'broad discretion in structuring discovery.'"  *Hussain v. Nicholson*, 435 F.3d 359, 364 (D.C. Cir. 2006) (quoting *Edmond v. U.S. Postal Serv. Gen.*

*Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991)); *see also Galvin v. Eli Lilly & Co.*, 488 F.3d 1026,

1030 (D.C. Cir. 2007) (recognizing that district courts have broad discretion over discovery).

Consequently, "[t]he decision to grant or deny a motion to strike is vested in the trial judge's

sound discretion." *Canady v. Erbe Elektromedizin GmbH*, 384 F. Supp. 2d 176, 180 (D.D.C.

2005); *see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145,

150 (D.C. Cir. 1996) (holding that the Circuit reviews a trial court's determination of motion to

strike for abuse of discretion).

 Under the Federal Rules of Civil Procedure, parties are required to provide to the

opposing party, without "awaiting a discovery request," the contact information of "each

individual likely to have discoverable information—along with the subjects of that

information—that the disclosing party may use to support its claims or defenses, unless the use

would be solely for impeachment," in their initial disclosures. FED. R. CIV. P. 26(a)(1)(A). Rule

26 further requires a party to "supplement" any disclosure made under Rule 26(a) "if the party

learns that in some material respect the disclosure or response is incomplete or incorrect, and if

the additional or corrective information has not otherwise been made known to the other parties

during the discovery process or in writing." FED. R. CIV. P. 26(e)(1). Generally, "[i]f a party

fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not

allowed to use that information or witness to supply evidence on a motion, at a hearing, or at

trial." FED. R. CIV. P. 37(c).

 In the case at hand, the defendants did not breach their discovery obligations regarding

the use of Elena Gillis as a witness. While the defendants did not identify her by name in their

initial disclosures to the plaintiff on July 18, 2014, they specified that "[n]umerous George

Washington University students attended the February 15, 2011 event" and that "[a]s discovery

progresses the parties may consider how and to what extent information identifying these

individuals may be disclosed" in light of restrictions on disclosure of student contact

information.  Defs. Brown, Glaubach, Bartin, and GW's Initial Disclosures at 3, ECF No. 31.

On March 19, 2015, nearly a year before discovery closed in the case, the defendants

supplemented that disclosure to identify Elena Gillis by name.  *See* Pl.'s Mot. Strike, Exs. 2–3

ECF No. 53-2–53-3.  Conceding that a party's discovery obligations may be satisfied where

"subsequent disclosures in discovery have corrected the failure to disclose in initial dislcosures,"

Pl.'s Reply Supp. Mot. Strike at 4, ECF No. 55 (emphasis omitted) (discussing *Kapche v.*

*Holder*, 677 F.3d 454, 468 (D.C. Cir. 2012)), the plaintiff nonetheless asserts that the defendants

failed to satisfy Rule 26's requirement that the subject of the information possessed by the

witnesses be disclosed, *see id.*  Yet, the defendants explained that the GW students with

discoverable information were those that "attended the February 15, 2011 event," indicating that

the "subject" of the information pertained to their observations as attendees.  Rule 26 requires

only that a party "indicat[e] briefly the general topics on which such persons have information"

and is intended "not [to] be burdensome."  *See* Fed. R. Civ. P. 26(a)(1)(A) advisory committee's

note to 1993 amendment.  This requirement was fulfilled by the defendants' indication that Elena

Gillis was present in the auditorium during the incident underlying the instant action.

The plaintiff is correct, however, that the declaration was not timely filed.  Local Rule

5.4(b)(5) provides: "Electronically filing a document that contains a declaration, verification,

certificate, sworn statement, oath or affidavit certifies that the original signed document is in the

possession of the attorney or *pro se* party responsible for the filing and that it is available for

review upon request by a party or by the Court."  LCvR 5.4(b)(5).  While the defendants suggest

the rule contemplates the filing of an unsigned declaration when no signed declaration exists, no

reasonable reading of the rule supports their position.  Instead, this rule merely contemplates that when an unsigned declaration is electronically filed, the filing party is certifying that the original signed declaration exists in the possession of counsel or the *pro se* party.  Here, the defendants concede that at the time of the filing of the unsigned declaration, their counsel did not have an executed version of it in their possession.  *See* Defs.' Opp'n Pl.'s Mot. Strike at 14 ("In this case, the declaration had been reviewed and approved for filing by the declarant but her signature had not been secured as she was out of the country.").  Nor have the defendants at any point requested leave of Court for any extension of time to file this declaration.  Thus, the declaration was untimely filed without leave of Court.  Consequently, the plaintiff's motion to strike is granted to the extent it requests striking of the Declaration of Elena Gillis.

### B.      The Plaintiff's Fourth Amendment False Arrest Claim

The plaintiff moves for partial summary judgment only on his false arrest claim in Count I, and solely on the ground that no probable cause existed to support his arrest by the individual defendants.  *See generally* Pl.'s Mot.; Pl.'s Mem.  With respect to the plaintiff's Fourth Amendment false arrest claim, the parties principally dispute the following legal issues: (1) whether Corporal Brown and Captain Glaubach acted under color of state law when they undertook to remove the plaintiff from the auditorium; (2) whether the individual defendants may invoke the defense of qualified immunity and, if so, whether they are entitled to that defense; (3) whether probable cause existed to arrest the plaintiff for disorderly conduct, unlawful entry, or assault on a police officer; and (4) whether, assuming a constitutional violation occurred, GW is liable.  The parties' contentions are addressed *seriatim* below.

    1.       *Corporal Brown and Captain Glaubach Acted Under Color of*
                *State Law When They Approached, Removed and Arrested the Plaintiff*

Under U.S.C. § 1983, only deprivations of rights "committed by a person acting under the color of state law" are actionable. *West v. Atkins*, 487 U.S. 42, 48 (1988). While the defendants do not dispute that the GWPD officers acted under color of state law in handcuffing and formally arresting the plaintiff, they contend that "Corporal Brown and Captain Glaubach were not acting under color of state law in approaching Mr. McGovern and then escorting him out of the Auditorium." Defs.' Mem. at 12–13. At this early point in their interaction with the plaintiff, the defendants assert they "were focused solely on enforcing a 'zero tolerance' policy for violation of the university's Disruptions and Demonstrations Policies in approaching Mr. McGovern about his behavior and then removing him from the Auditorium when he refused to comply with their requests to leave." *Id.* at 13. Noting that "[a] private property owner such as the university has the right to ask any person without lawful authority to remain on the premises to leave," the defendants posit that "[a]cting to enforce that right does not implicate government authority or official conduct under color of law," notwithstanding Corporal Brown and Captain Glaubach's status as SPOs. *Id.*

In support of their position, the defendants rely upon out-of-Circuit authority holding that where "Special Patrolm[e]n," similar in status to SPOs, made "repeated requests that [the plaintiff] leave the [defendant's] property," no state action was involved until "their subsequent arrest of [the plaintiff], which was only possible because of the police powers granted to them." *Kalfus v. N.Y. & Presby. Hosp.*, 706 F. Supp. 2d 458, 470 (S.D.N.Y. 2010); *see* Defs.' Mem. at 13–14. The defendants also rely upon authority from the District of Columbia that distinguishes between an SPO's actions "as a private citizen on behalf of his private employer" and those "authorized by his commission as a special policeman." *United States v. McDougald*, 350 A.2d

16

375, 378 (D.C. 1976); *see* Defs.' Mem. at 14.  The plaintiff counters that under the applicable

law, "[i]t is irrelevant that Brown or Glaubach might have taken the same action had either acted

in a purely private capacity when, in fact, their actions were taken as special police officers."

Pl.'s Opp'n at 11.  In support of his position, the plaintiff cites *Maniaci v. Georgetown*

*University*, 510 F. Supp. 2d 50 (D.D.C. 2007), where the plaintiff was found to have adequately

pleaded state action by alleging that SPOs employed by a private university forcibly removed

him from the university's property, *id.* at 67–69.  *See* Pl.'s Opp'n at 9–10.  The plaintiff is

correct.

The Supreme Court has explained, "[i]f an individual is possessed of state authority and

purports to act under that authority, his action is state action.  It is irrelevant that he might have

taken the same action had he acted in a purely private capacity or that the particular action which

he took was not authorized by state law." *Griffin v. Maryland*, 378 U.S. 130, 135 (1964).  For

this reason, "the inquiry must be whether there is a sufficiently close nexus between the State

and the challenged action of the regulated entity so that the action of the latter may be fairly

treated as that of the state itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974).

Under District of Columbia law, "[t]he power of arrest . . . is the sole factor which distinguishes

the holder of a special police commission from a private citizen." *McDougald*, 350 A.2d at 378.

Consequently, while SPOs are not possessed of state authority "in *all* their actions," they "act as

a state agent or instrument when the challenge 'involves the arrest of a suspect and actions

related thereto.'" *Woodward & Lothrop v. Hillary*, 598 A.2d 1142, 1146 (D.C. 1991) (emphasis

in original) (quoting *Alston v. United States*, 518 A.2d 439, 443 (D.C. 1986)).  "[T]he required

nexus with the state is furnished not by the fact of the commission alone . . . but by the

convergence of the authority bestowed by commission and the officers' actions." *Id.* at 1145–46.

In the instant case, the action at issue is the SPOs' conduct in approaching the plaintiff and forcibly removing him from the auditorium where the Clinton address was taking place. Plainly, that action was "related" to the plaintiff's ultimate arrest for the offense of disorderly conduct, which was itself plainly an exercise of the power conferred on the SPOs by their commissions and therefore constitutes state action. *See Hillary*, 598 A.2d at 1146.

Even had the interaction between the plaintiff and the SPOs not culminated in a formal arrest, the actions here would nevertheless constitute state action. Admitting the action at issue was taken to enforce GW's right to eject persons from its private property, the defendants make the broad pronouncement that "[a]cting to enforce that right does not implicate government authority or official conduct under color of law." Defs.' Mem. at 13. Yet, the defendants' argument is fatally undermined by applicable case law. In *Griffin v. Maryland*, the Supreme Court found state action where an employee of a private amusement park, deputized as a sheriff under state law, ordered four African-Americans to leave the park in accordance with the park's policy of segregation and arrested them when they refused. *See* 378 U.S. at 132. In so holding, the Court explained that the park employee, "in ordering the petitioners to leave the park and in arresting and instituting prosecutions against them[,] purported to exercise the authority of a deputy sheriff," including by wearing a sheriff's badge and identifying himself as such. *Id.* at 135. That the defendant "might have taken the same action had he acted in a purely private capacity" was not dispositive of whether state action occurred. *Id.*

Similarly, District of Columbia law specifically cloaks with state authority actions, short of formal arrest, taken to enforce private property rights. For example, District of Columbia law makes it a misdemeanor for a person to refuse to leave private property upon the demand a person lawfully in charge of the premises and "permits a person lawfully in charge of premises to

act through an agent, including the police," to eject persons from her private property.  *Bauldock v. Davco Food, Inc.*, 622 A.2d 28 (D.C. 1993).  The D.C. Court of Appeals has explained that SPOs, in particular, are "employed for one sole purpose, that of guarding from depredation the property" of their private employers.  *McDougald*, 350 A.2d at 378; *see Franklin v. United States*, 271 A.2d 784, 785 (D.C. 1970) ("[SPOs] are commissioned for the special purpose of protecting the property on the premises of the employer . . . .").  Consequently, while this case presents no occasion to consider whether *every* action taken by an SPO to enforce his employer's private property rights would constitute state action, existing case law supports the conclusion that the SPOs' actions here in approaching the plaintiff and forcibly removing him from the auditorium, leading to a formal arrest, were state action.[4]

The D.C. Court of Appeals' decision in *McDougald* supports this conclusion, contrary to the defendants' interpretation of the case.  In *McDougald*, an SPO employed by Giant Food, Inc., advised a food clerk, who had witnessed an alleged theft from one of the employer's stores, not to speak to defense counsel unless the prosecutor was also present.  350 A.2d at 376.  The Court of Appeals concluded that the SPO's action in so advising his fellow employee was not "authorized by his commission as a special policeman," which conferred the "power of arrest" for the purpose of enabling him to "guard[] from depredation the property of those who paid him for his services."  *Id*. at 378.  Consequently, the SPO "was acting in his capacity as a

---

[4]       The defendants rely on *Kalfus v. N.Y. & Presby. Hosp.*, 706 F. Supp. 2d 458 (S.D.N.Y. 2010), to support their position that SPOs do not act under color of state law when taking action short of an arrest to protect their employer's private property, but the *Kalfus* decision considered First, not Fourth, Amendment rights.  As is explained below, under the applicable Supreme Court precedent, individuals possess no First Amendment rights on private property, with limited exceptions.  In *Kalfus*, the "Special Patrolman" approached the plaintiff while on his employer's private property, so the Court concluded "there was no state action on which [the plaintiff] may claim an abridgement of his First Amendment rights."  *Id*. at 470.  While perhaps a sounder articulation of the decisional principle in the case would have emphasized the private nature of the property involved rather than the nature of the Special Patrolman's actions, regardless, the case did not present an occasion to consider whether a Fourth Amendment false arrest claim would lie based on the Special Patrolman's actions in approaching the plaintiff.

representative of a private corporation when he conveyed this policy to the employees under his supervision." *Id.* at 79.

*McDougald* considered the situation in which one employee advised another employee of the policy of their mutual employer. In the instant matter, by contrast, Corporal Brown and Captain Glaubach, as employees of GW, approached the plaintiff for the purpose of enforcing their employer's policy against a non-employee violating that policy. Moreover, the defendants emphasize that in their interactions with the plaintiff these two officers were acting in accordance with the GWPD's Standard Operating Procedure 2.1.14, which outlines the escalating "practices and procedures to be followed by GW security personnel in response to actions by a potential *arrestee*," Defs.' Mem. at 12 (emphasis added), leaving no question that Corporal Brown and Captain Glaubach acted within the scope of their power to arrest in approaching and removing the plaintiff. Accordingly, the SPOs were acting under color of state law in approaching the plaintiff and removing him from the auditorium.[5]

### 2. *Whether the Individual Defendants May Invoke the Defense of Qualified Immunity Need Not Be Addressed*

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In this way, the defense "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the

---

[5]     This conclusion mitigates the concern that "[a] conflict of interest, even an institutional leaning, exists for university police departments to misuse their commissioned authority to arrest to enforce mere university policy," Pl.'s Mem. at 2, because individuals acting under color of state law must adhere to the same standards whether privately or publicly employed.

law.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 744 (2011)).  In determining whether a

government official should be entitled to qualified immunity, the two pertinent questions are (1)

"whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a

constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of

the defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533

U.S. 194, 201 (2001)).

In the instant matter, the parties hotly dispute whether the individual defendants may

invoke the defense of qualified immunity at all, given that they are not state actors for all

purposes.  In determining whether qualified immunity applies to shield a defendant from liability

under § 1983, the Supreme Court has distinguished private employees performing state

functions, like the individual defendants in this case, from government employees, who are

presumptively entitled to the defense.  Thus, in *Richardson v. McKnight*, 521 U.S. 399 (1997),

the Court considered whether private prison guards could invoke the defense, noting that "this

Court has . . . accorded immunity where a 'tradition of immunity was so firmly rooted in the

common law and was supported by such strong policy reasons that Congress would have

specifically so provided had it wished to abolish the doctrine,'" *id.* at 403 (quoting *Wyatt v. Cole*,

504 U.S. 158, 164 (1992)) (internal quotation marks omitted).  "[L]ook[ing] both to history and

to the purposes that underlie government employee immunity in order to find the answer," *id.* at

404, the Court concluded the defense was not available to the private prison guards, *id.* at 401.

In doing so, the Court emphasized that "the most important special government immunity-

producing concern" is "unwarranted timidity," finding that this concern "is less likely present, or

at least is not special, when a private company subject to competitive market pressures operates a

prison." *Id.* at 409.  The Court also recognized other goals of qualified immunity that should be

considered when determining whether that defense may be accorded to a particular defendant: "ensur[ing] that talented candidates are not deterred by the threat of damages suits from entering public service" and avoiding "distract[ing] . . . employees from their duties." *Id.* at 411.

Although no party identifies authority binding on this Court that squarely addresses the question presented here, both the plaintiff and the defendants contend that consideration of the factors outlined in *Richardson* supports their respective position. *See* Pl.'s Mem. at 36–40; Defs.' Mem. P. & A. Opp'n Pl.'s Mot. Summ. J. ("Defs.' Opp'n") at 22–24, ECF No. 47; Pl.'s Reply at 23–25. The plaintiff states he "is unaware of a 'firmly rooted' tradition of providing immunity for the type of private actors in this case," and, moreover, that the "purposes served by recognizing qualified immunity for public police officers are not present where defendants are privately employed security officers." Pl.'s Mem. at 37. Specifically, the plaintiff asserts that "unwarranted timidity" as a concern "is not present here . . . given [these officers'] primary employment purpose to enforce highly restrictive internal private university policy" and that "competitive financial or marketplace pressure are present, as they were in *Richardson*." *Id.* at 38. The plaintiff also notes that as a private employer, GW offers insurance and benefits to its employees that alleviate concerns that employees will be deterred from entering public service or distracted from their duties by the potential of lawsuits. *Id.* at 39–40. The defendants counter that "*Richardson* concerned privately employed prison guards, not SPOs." Defs.' Opp'n at 22. They also assert that "[t]here is no evidence in the record that GW, as a private university, has [market] pressures" of the variety found to militate against immunity in *Richardson*, and that "[t]here is no . . . evidence here" that GW is free "from many civil service law restraints" and can "offset any increased employee liability risk with higher pay or extra benefits." *Id.* at 23.

To be sure, university-employed SPOs' entitlement to the defense of qualified immunity is a question of significant importance to the SPOs themselves, the universities who employ them, and the public, but only to the extent those officers commit constitutional violations.  As is explained below, the SPOs in this case committed no constitutional violation, obviating the need to resolve this issue here.  *See Pearson*, 555 U.S. at 232 (explaining that to overcome the defense of qualified immunity, a plaintiff must "make out a violation of a constitutional right" *and* show that "the right at issue was 'clearly established' at the time of the defendant's alleged misconduct").  Consequently, whether, and under what circumstances, SPOs may invoke the defense of qualified immunity remains an issue left to another case.

### 3.    *The Plaintiff's Arrest Was Supported by Probable Cause*

"Whether [an] arrest was constitutionally valid depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it . . . ."  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  Consequently, at the core of the parties' dispute over the appropriateness of summary judgment on Count I is the question whether probable cause to believe the plaintiff committed any crime existed at the time of the plaintiff's arrest.  The defendants assert that at the time of the plaintiff's arrest, probable cause existed for three separate crimes: disorderly conduct under D.C. Code § 22-1321, unlawful entry under D.C. Code § 22-3302(a)(1), and assaulting a police officer under D.C. Code § 22-405(b).  *See* Defs.' Mem. at 20–23; Defs.' Reply at 14–15.  The plaintiff disagrees, contending that probable cause was lacking for each of these offenses.  *See* Pl.'s Mem. at 13–27.  The defendants have the better of the argument.

An arrest is supported by probable cause if, at the time of the arrest, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had

committed or was committing an offense." *Beck*, 379 U.S. at 91.  Such a belief need not be

"correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983).  Moreover,

probable cause does not "require the same type of specific evidence of each element of the

offense as would be needed to support a conviction," *Adams v. Williams*, 407 U.S. 143, 149

(1972), although "the police cannot establish probable cause without at least *some* evidence

supporting the elements of a particular offense, including the requisite mental state," *Wesby v.

District of Columbia*, 765 F.3d 13, 20 (D.C. Cir. 2014) (emphasis in original).

 "To determine whether [an officer] had probable cause to believe that [a plaintiff was]

violating District of Columbia law, we look to District law to identify the elements of each of

those offenses." *Id.* at 19.  While the plaintiff in this case was arrested for the offense of

disorderly conduct under D.C. Code § 22-1321(b), that "need not be the criminal offense as to

which the known facts provide probable cause" because "an arresting officer's state of mind . . .

is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

Accordingly, if probable cause existed as to any crime, the plaintiff cannot establish his Fourth

Amendment false arrest claim.

 The parties dispute the point in time at which an arrest took place, and, thus, they

disagree as to the universe of facts relevant to the analysis of whether probable cause existed.

The defendants argue that no arrest took place until the plaintiff "had been escorted out of the

Auditorium and into the MPA Building lobby," Def.'s Mem. at 18, while the plaintiff maintains

that he was under arrest "[f]rom the moment [Corporal Brown] first put his hands on" the

plaintiff, Pl.'s Opp'n at 14.

 The Fourth Amendment protects against all "seizures," not only formal arrests.  *See Terry

v. Ohio*, 392 U.S. 1, 16 (1968) ("It is quite plain that the Fourth Amendment governs 'seizures'

of the person which do not eventuate in a trip to the station house and prosecution for crime—
'arrests' in traditional terminology."). That amendment's protections are implicated whenever
an "officer, by means of physical force or show of authority, has in some way restrained the
liberty of a citizen." *Id.* at 19 n.16. Thus, while the plaintiff is correct that no formal arrest need
take place for an unconstitutional seizure to occur, he goes too far in asserting that he was seized
as soon as Corporal Brown laid hands on the plaintiff. The parties do not dispute, as the video
footage of the encounter confirms, that Corporal Brown's hand rested on the plaintiff's arm
during at least part of the time that he spoke to the plaintiff while both men were standing still in
the auditorium. *See Hatchet* Video 00:00–00:05; Defs.' SMF ¶ 31; Pl.'s SMF ¶ 39, 48. In these
circumstances, Corporal Brown's placing of his hand on the plaintiff can only reasonably be
understood not as a restraint on liberty but as an attempt to get the plaintiff's attention. *See, e.g.*,
*United States v. Burrell*, 286 A.2d 845, 846 (no seizure under *Terry* and the Fourth Amendment
where an officer "merely touched appellee's elbow, an action used as a normal means of
attracting a person's attention" and "coupled this touching with the simultaneous request to
speak with appellee"). Only once Corporal Brown undertook to control the plaintiff's
movements, using physical contact to remove the plaintiff from the auditorium, did a seizure
occur, triggering the Fourth Amendment's protections.

　　　　Consequently, the next question is whether the officers' seizing the plaintiff by removing
him from the auditorium was reasonable under the Fourth Amendment. A seizure less intrusive
than an arrest may be reasonable under the Fourth Amendment even in the absence of the
probable cause required for an officer to make an arrest. *See Terry*, 392 U.S. at 24.
Nevertheless, the moment at which the seizure here became an arrest need not be parsed because

probable cause existed to arrest the plaintiff for unlawful entry when the officers began removing the plaintiff from the auditorium.

At the time of the events in question, District of Columbia law made it a misdemeanor for a person, "without lawful authority, [to] enter, or attempt to enter, any private dwelling, building, or other property, or part of such dwelling, building, or other property, against the will of the lawful occupant or of the person lawfully in charge thereof" or to "refuse to quit the same on the demand of the lawful occupant, or the person lawfully in charge thereof." D.C. Code § 22-3302(a). Under this law, "[t]he offense of unlawful entry includes . . . cases where a person who has entered the premises with permission subsequently refuses to leave after being asked to do so by someone lawfully in charge." *District of Columbia v. Murphy*, 631 A.2d 34, 37 (D.C. 1993). As the D.C. Circuit has explained, where an officer "personally ask[s] the [plaintiff] to leave and the [plaintiff] . . . refuse[s]," that "refusal . . . supplie[s] the probable cause the officer[] need[s] to make an arrest for unlawful entry." *Wesby*, 765 F.3d at 24 (quoting *Murphy*, 631 A.2d at 38). Moreover, to support a valid unlawful entry conviction, "the government need only prove that the 'will' of a lawful occupant was objectively manifest through either express or implied means, not that the will was subjectively understood by the defendant." *Ortberg v. United States*, 81 A.3d 303, 308 (D.C. 2013) (footnotes omitted).

In the instant case, the defendants contend that "[p]robable cause to arrest Mr. McGovern for unlawful entry arose" after he "ignored Corporal Brown's requests" in the auditorium. Def.'s Mem. at 22.[6] In urging that this contention be rejected, the plaintiff posits that "there must be a

---

[6]     The defendants also contend that the plaintiff "openly def[ied] the terms of the invitation he had accepted when he stood during the speech," Defs.' Mem. at 22, arguing that the plaintiff "disregarded the condition GW expressly included in the notice informing him that he had successfully registered to attend: 'Guests must be seated by 11:40 am,'" *id.* at 23. This dubious contention need not be considered at length in light of the Court's conclusion that probable cause for an unlawful entry arrest otherwise existed. Nevertheless, the defendants' argument that the plaintiff had notice of a policy against standing demonstrations at such events would be significantly stronger were the defendants in the position of asserting that GW took the prudent step of advising the event's attendees of any

demand, a directive from a person lawfully in charge" and that "directive must be specifically for the person to 'leave the property,'" asserting that "[n]either of these requirements are met by the words uttered by Brown." Pl.'s Mem. at 24. As additional support for his argument, the plaintiff avers that he "did not even indicate awareness of Brown's presence, much less that he heard Brown's words" and that "Brown did not . . . ensure the visibility of his uniform, though he easily could have." *Id.* at 26. The plaintiff also notes that Corporal Brown "to this date, does <u>not</u> assert there was a violation of the unlawful entry . . . statute." *Id.* at 24 (emphasis in original).

The plaintiff's arguments are unavailing. As a threshold matter, it is irrelevant to the probable cause inquiry whether an officer subjectively believed probable cause existed as to a given criminal offense. *See Devenpeck*, 543 U.S. at 153 ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."). Accordingly, contrary to the plaintiff's suggestion, Corporal Brown's beliefs as to the existence of probable cause for unlawful entry have no bearing on the question of the constitutionality of the seizure at issue here. Nor does the probable cause analysis take into account an arrestee's state of mind in any way, and, thus, it is also irrelevant whether the plaintiff was in fact aware of the officers' presence or heard Corporal Brown's words. Rather, the probable cause analysis is undertaken from the perspective of the officer and asks whether he could have reasonably believed that probable cause existed as to any crime.

In this case, no reasonable jury could find that the officers lacked probable cause to arrest the plaintiff. As noted *supra* Part I, there is no genuine dispute that while standing near the plaintiff, Corporal Brown placed his arm on the plaintiff and stated at least two times, without

---

such policy. *See* Pl.'s Opp'n at 23 (averring that the plaintiff "was never given notice of university policies" pertaining to demonstrations and disruptions at university events).

raising his voice, "Sir, can you please come with me."[7]  In view of the clarity of these facts, the plaintiff is relegated to arguing that these words do not "constitute[] a directive to leave the premises."  Pl.'s Mem. at 26.  The plaintiff strains to avoid the plain import of Corporal Brown's direction by pointing out specific words not used, stating that "on their face [those words] do not reference leaving, do not reference the premises, do not reference the auditorium, and use language that literally constitute an inquiry as to capability and, if treated generously, constitute a mere request and not a directive or demand."  Pl.'s Opp'n at 4.  Notwithstanding the plaintiff's suggestions to the contrary, under District of Columbia law, the will of the lawful occupant need only be "objectively manifest" through "express or implied means," *Ortberg*, 81 A.3d at 308.  Although the statute requires a "demand" before a person may be held liable for refusing to quit another's premises, such demand need not take any particular form, as long as a reasonable person would understand that he was required to leave.  Consequently, for the offense of unlawful entry, the existence of probable cause turns on whether a reasonable person would believe the plaintiff was refusing to quit the premises after being required to do so by a person lawfully in charge.  *See Wesby*, 765 F.3d at 24 (explaining in affirming denial of summary judgment that "[h]ad the officers personally asked the Plaintiffs to leave and the Plaintiffs had refused, such a refusal would have supplied the probable cause the officers needed to make an arrest for unlawful entry" (internal quotation marks and alterations omitted)).

At the time they seized the plaintiff, Corporal Brown and Captain Glaubach knew that the plaintiff was the only person standing, as opposed to sitting, in the auditorium; that Captain

---

[7]    The plaintiff's position that he heard no words spoken by Corporal Brown does not create a factual dispute as to whether Corporal Brown spoke to him, what was said, or in what volume.  Instead, the plaintiff's assertion may explain why he failed to follow the officer's instructions.  In any event, the plaintiff presents no evidence contradicting the defendants' assertions, which, moreover, are corroborated in part by video footage of the events. *Cf. Murphy*, 631 A.2d at 38–39 (denying summary judgment on false arrest claim where "the record does not exclude the possibility that the police seized [the plaintiff] without knowing whether [any person] had asked him to leave and without asking him to do so themselves").

Glaubach, who was dressed in a suit and wearing a GWPD badge, could readily be seen by the plaintiff; that Corporal Brown, who was dressed in a police uniform, had made physical contact with the plaintiff and asked the plaintiff at least twice to "come with" him; and, as the plaintiff himself admits, that the plaintiff had not acknowledged the officers' presence in any way, in spite of Corporal Brown's making physical contact and speaking to the plaintiff.  From these facts, the officers could have reasonably believed that the plaintiff was aware that he was acting in a manner different from every other person in the auditorium and, to avoid further disruption, was being required to leave by persons with lawful authority to order him to do so; and was refusing to comply with the officers' lawful request, in violation of D.C. Code § 22-3302(a). Thus, the officers had probable cause to arrest the plaintiff for unlawful entry at the time they began removing him from the auditorium.[8]

Nor was probable cause lost at any point after the officers undertook to remove the plaintiff.  The parties do not dispute, as the video footage reveals, that Corporal Brown expended some effort in getting the plaintiff from where he was seated to the aisle, and that the plaintiff reached down to grab the arms of seats he passed.  *See Hatchet* Video 00:06–00:11; Defs.' SMF ¶ 31–32; Pl.'s SMF ¶ 50.  Although the plaintiff asserts that in that moment he may simply have been trying to "get [his] balance" because he "was about to fall on . . . folks" seated between him and the aisle, Pl.'s Mot., Ex. A, McGovern Dep. 68:12–18, the defendants allege he was actively trying to resist the officers, *see* Defs.' SMF ¶¶ 31–32.  Even assuming the officers recognized the plaintiff's grabbing of the arms of seats as an attempt to maintain balance and not resistance, however, it would not negate the probable cause for unlawful entry that already existed by that

---

[8]     Besides being irrelevant to the probable cause analysis, the plaintiff's contention that he did not know he was required to leave the auditorium at the time he was seized seems disingenuous in light of his averment that he "said, U[h]-oh, what's going to happen next," upon seeing Captain Glaubach approaching him.  Pl.'s Mot, Ex. A, McGovern Dep. 74:15–17.

time.  The plaintiff also emphasizes that he shouted, "Who are you?," at the officers while being

removed, suggesting he either did not know the officers' identity or was challenging the officers'

authority to remove him from the auditorium.  Pl.'s Mem. at 27.  Yet, the plaintiff did so only

after first shouting, "So this is America.  This is America!," suggesting he was aware he was

being removed from the auditorium on account of his standing demonstration.  *Hatchet* Video

00:15–00:22; *see* Pl.'s SMF ¶ 53; Defs.' SMF ¶ 33.  Consequently, neither the plaintiff's actions

nor his words during his removal from the auditorium negated the existence of probable cause

for the offense of unlawful entry.

In these circumstances, no reasonable jury could find a lack of probable cause to arrest

the plaintiff for the offense of unlawful entry.  The parties' contentions regarding the existence of

probable cause as to disorderly conduct and assaulting a police officer, therefore, need not be

addressed, *see Devenpeck*, 543 U.S. at 153, and summary judgment is appropriate on the

plaintiff's Fourth Amendment claim in Count I as to Corporal Brown, Captain Glaubach, and

Officer Barton.

### 4.    *GW Is Not Liable*

Summary judgment is also appropriate as to GW.  The plaintiff agrees with the

defendants that GW, as an institutional defendant, may only be held liable for the constitutional

violations of its employees that it caused, *see* Pl.'s Mem. at 28 (citing *Monell v. Dep't of Soc.

Servs.*, 436 U.S. 658, 690–91 (1978)), contending that GW has "elevat[ed] itself effectively

above the law" by training its GWPD officers to use D.C.'s disorderly conduct statute in a

manner that "contravenes the clearly stated law of the District of Columbia," *id*. at 31.

Specifically, the plaintiff argues that the statute "does not apply to private gatherings," such as

the Clinton address, while the GWPD's Policy Notes on the statute state that it "reinforces the

University policy against disruption of university events." *Id.* (quoting Pl.'s Mot, Ex. T at AA

000303).  The plaintiff's arguments notwithstanding, GW cannot be held liable in the absence of

a constitutional violation.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)

(noting the two pertinent questions when determining *Monell* liability are "whether plaintiff's

harm was caused by a constitutional violation" and "whether the [entity] is responsible for that

violation").  As explained above, the plaintiff has not established that the individual defendants

falsely arrested the plaintiff in violation of his Fourth Amendment rights.  Accordingly, GW is

entitled to summary judgment as to the plaintiff's Fourth Amendment false arrest claim in

Count I.

### C.        The Plaintiff's Fourth Amendment Excessive Force Claim

The Fourth Amendment also protects individuals against the use of excessive force by

officers effecting a seizure.  *See Graham v. Connor*, 490 U.S. 386, 388 (1989).  Whether a

seizure comports with the Fourth Amendment is determined by application of an "objective

reasonableness" standard, which requires "careful attention to the facts and circumstances of

each particular case, including the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest

or attempting to evade arrest by flight."  *Id.* at 396.  "The 'reasonableness' of a particular use of

force must be judged from the perspective of a reasonable officer on the scene, rather than with

the 20/20 vision of hindsight."  *Id.*  Accordingly, "[n]ot every push or shove, even if it may later

seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Id.*

(internal quotation marks omitted).  Rather, "[t]he calculus of reasonableness must embody

allowance for the fact that police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

necessary in a particular situation."  *Id.* at 396–97.  Thus, excessive force may be found "if 'the

nature and quality of the intrusion on the individual's Fourth Amendment interests' is weightier than the 'countervailing government interest at stake.'" *Rudder v. Williams*, 666 F.3d 790, 795 (D.C. Cir. 2012) (quoting *Graham*, 490 U.S. at 396).

With respect to the plaintiff's excessive force claim in Count II, the defendants urge summary judgment on the ground that "the officers used force appropriate under [GWPD's Standard Operating Procedures] to gain physical control over Mr. McGovern" when they first undertook to remove him from the auditorium, and that the plaintiff's "resistance [exiting the auditorium] escalated the situation to Level III, permitting" various policing tactics that were not used by the officers in this case, such as "a takedown" of the plaintiff and use of pepper spray. Defs.' Mem. at 25.[9]  As noted above, the plaintiff has not moved for summary judgment on Count II, but opposes the defendants' motion, reiterating his argument that he "had not broken the law at the time that force was used" and thus "[n]o seizure or use of force was authorized." Pl.'s Opp'n at 32.  The plaintiff further contends that the force used was "unreasonably excessive" given that the plaintiff "was not arrested for a crime, but for silent standing," "could not have been resisting a law enforcement officer when the officers failed to show their authority and jumped him from behind," does not appear to have posed or been viewed by Corporal Brown and Captain Glaubach as "constituting a threat to physical safety," and "was left bloodied, bruised and lacerated by Brown and Glaubach, requiring treatment by EMTs to stanch

---

[9]    The defendants also assert their entitlement to summary judgment on the plaintiff's Fourth Amendment excessive force claim on the ground that the plaintiff "cannot meet his burden of proof as to the standard of care with regard to how he was handcuffed." Defs.' Mem. at 13.  The plaintiff does not press an excessive force claim based specifically on the manner in which he was handcuffed either in his Complaint or in his opposition to the defendants' motion for summary judgment.  Consequently, to the extent any such claim was intended to be made, the plaintiff has conceded the argument.  *See, e.g.*, *Abdus-Sabur v. Hope Vill., Inc.*, No. CV 16-156 (RBW), 2016 WL 7408833, at *9 (D.D.C. Dec. 22, 2016) (citing *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 Fed. App'x 8 (D.C. Cir. 2004) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.")).

the bleeding." *Id.* at 32–33.  Finally, the plaintiff "draws attention not only to the totality of the force used but to the particularly gratuitous slamming of his body into the doorjam right in front of Chief Hay as the officers forced McGovern out of the auditorium." *Id.* at 33.

As explained above, the seizure at issue in this case was supported by probable cause that the plaintiff was refusing to quit private property, evidenced in part by the plaintiff's objectively apparent resistance of the authority of the SPOs.  Accordingly, the defendants were entitled to use some force.  *Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").

Nor are the plaintiff's arguments regarding the *Graham* factors persuasive.  Contrary to the plaintiff's assertion, probable cause existed to arrest the plaintiff for refusing to quit GW's property.  While less serious than an offense involving outright violence, the offense for which plaintiff was arrested by its very nature involves resistance of lawful authority, requiring arresting officers to use some force to gain compliance.  Moreover, as explained above, it would have been reasonable for the officers to perceive the plaintiff's failure to acknowledge their initial presence as the plaintiff ignoring, rather than lacking awareness of, the officers' authority.  Further, the plaintiff resisted the officers' physical contact while being removed from the auditorium.  From a reasonable officer's perspective, this resistance would be particularly troubling in the context of a high-profile, high-security event involving the Secretary of State of the United States.  Finally, video footage shows that the plaintiff's contact with the door while being removed from the auditorium, described by the plaintiff as "gratuitous slamming," occurred while the officers were exerting considerable effort to control the movements of the plaintiff, who was resisting them.  *See Hatchet* Video 00:21–00:24.  While on a motion for

summary judgment, "facts must be viewed in the light most favorable to the nonmoving party,"
when a party's version of the facts is "blatantly contradicted by the record," that version "should
not [be] adopt[ed]" for purposes of the motion.  *Scott*, 550 U.S. at 380.  Although the plaintiff
urges a version of events in which the officers exercised full control of him, deliberately
slamming him into the door, the video footage reflects that the plaintiff's contact with the door
occurred while he struggled against the officers' forcible but not otherwise unreasonable removal
of him from the auditorium.

In these circumstances, no reasonable jury could determine the force used was
objectively unreasonable, and, thus, the plaintiff has not shown a violation of a constitutional
right.  Accordingly, each of the defendants is entitled to summary judgment on the plaintiff's
Fourth Amendment excessive force claim in Count II.

### D.      The Plaintiff's First Amendment False Arrest & Excessive Force Claims

In his Complaint, the plaintiff asserts that his arrest "as he stood silently expressing
dissent violated his rights under the First . . . Amendment[]" and "effected an abridgment of his
free speech rights."  Compl. ¶ 93.  The plaintiff also asserts that "[t]he excessive use of force
was, in whole or in part, in retaliation for the fact that [the] 71-year-old [plaintiff] stood in silent
dissent and silent expression within the audience gallery."  Compl. ¶ 98.  In essence, the plaintiff
claims that his arrest and the use of force against him were in retaliation for his exercise of First
Amendment rights.  *See, e.g.*, *Patterson v. United States*, 999 F. Supp. 2d 300, 310 (D.D.C.
2013) (noting the D.C. Circuit has recognized "a First Amendment right not to be arrested in
retaliation for one's speech" (citing *Dellums v. Powell*, 566 F.2d 167, 195–96 (D.C. Cir. 1977))).

In his briefing on the instant motions for summary judgment, the plaintiff makes barely a
passing reference to the First Amendment.  Although the plaintiff takes care to note that his
conduct at the event was "within his clearly established constitutional rights to engage in

peaceable free speech activities and to petition to government . . . under the First Amendment without retaliation under color of law," Pl.'s Opp'n at 38, the plaintiff also states that "there is no suggestion by plaintiff that GW, as a private institution, must conform to the First Amendment when it issues internal policies regarding university events inside a private auditorium for which tickets are needed and where the public is expressly excluded," *id.* at 13–14 (citing Supreme Court case law strictly limiting the types of private property upon which the First Amendment applies).  In conceding that point, the plaintiff acknowledges that he possessed no First Amendment rights during the events at issue here.  *See*, *e.g.*, *Hudgens v. NLRB*, 424 U.S. 507, 520 (1976) (concluding "the constitutional guarantee of free expression has no part to play" in cases involving speech activities on private property unless the property has been wholly "dedicat[ed] . . . to public use").  Consequently, he has failed to establish the violation of a constitutional right, and each of the defendants is entitled to summary judgment on the plaintiff's First Amendment claims in Counts I and II.

IV.     **CONCLUSION**

        For the foregoing reasons, the plaintiff's motion to strike is granted, the defendants' motion for summary judgment is granted, and the plaintiff's motion for partial summary judgment is denied.  The Clerk of the United States District Court for the District of Columbia is directed to close this case.

        An appropriate Order accompanies this Memorandum Opinion.

        Date:  March 28, 2017

                                        _____
                                        BERYL A. HOWELL
                                        Chief Judge